Opinion
 

 KITCHING, J.—
 

 I
 

 Introduction
 

 Robert Lee Jenkins (Jenkins) appeals the judgment entered following his conviction by jury of two counts of torture (Pen. Code, § 206), one count of mayhem (Pen. Code, § 203), two counts of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)), one count of corporal injury to a cohabitant (§ 273.5, subd. (a)) and one count of possession of a firearm by a felon (§ 12021, subd. (a)).
 
 [1]
 
 Various allegations relating to use of a deadly weapon (§ 12022, subd. (b)) and intentional infliction of great bodily injury (§ 12022.7) were found to be true.
 

 Jenkins was sentenced to two consecutive life terms on the torture counts plus consecutive determinate terms on the felon firearm possession count and the deadly weapon use enhancement. Sentence on the corporal injury and assault with a deadly weapon count, and related enhancements, was stayed pursuant to section 654.
 

 Jenkins’s contentions in this appeal are directed at challenging (1) the convictions for torture, (2) the court’s sua sponte responsibility to provide a jury with a unanimity instruction, and (3) the calculation of the terms of his sentence. We conclude, for reasons explained below, evidence was sufficient to support Jenkins’s conviction and the trial court was not required to instruct the jury with CALJIC No. 17.01 because this case fell within the instruction’s “continuous course of conduct” exception. The judgment of conviction is affirmed. However, we order the one-year deadly weapon use
 
 *291
 
 enhancement stricken and find the original sentence imposed against Jenkins was erroneous with respect to the consecutive sentence computations. Therefore, we remand the cause for resentencing with directions.
 

 II
 

 Factual and Procedural Background
 

 The evidence, viewed in accordance with the usual rules governing appellate review, established that Jenkins and Mia Hines (Hines) lived together from January 10, 1992, to May 28, 1992, in a shed-like structure on the rear of property owned by Reverend and Mrs. Garvey (Garvey) on 67th Way in Long Beach. Mrs. Garvey is Jenkins’s sister. Jenkins’s mother lived in a room adjacent to the Garvey’s house, and his stepfather lived in a vehicle on the property.
 

 Hines and Jenkins dated in October 1991, but she soon ended the relationship after he assaulted her and made threats against her family. In January 1992, the couple reconciled and she moved into his residence on 67th Way. Over the next six months, Jenkins repeatedly beat Hines. On May 14, 1992, the police responded to a call about a disturbance at their residence. Hines was badly beaten but refused to press charges. On May 28, 1992, the police again responded to a call of a disturbance. Hines had been severely beaten, but this time Jenkins was arrested. Hines was hospitalized. After being interviewed by the police, Jenkins was released, but subsequently re-arrested.
 

 At trial, Hines testified to the beatings she incurred during the six months of their live-in relationship, which were initially drug-related, but also the result of Jenkins’s jealousy over her prior relationships. When Jenkins left the residence, he would lock the padlock on the outside of the shed door so she would be unable to leave. Jenkins beat her with a variety of objects. On many occasions he jabbed her hard in the chest and arms with an iron pipe, causing scars, cracked ribs and bleeding. He struck her with a screwdriver and hammer and hit her with a .357 magnum, breaking the skin on her shoulder and inner arm. He beat her with his fists, struck her on the face with a “big stick” steering wheel locking device, and broke an ashtray on her face. He broke her nose. The constant beatings left permanent scars on her chest, legs and face. After the beatings Jenkins would wrap her wounds and give her cocaine. Then they would have sex.
 

 Starting in March 1992, Jenkins repeatedly threatened to kill Hines and her family if she left him, so she stayed. Jenkins warned her if she ever
 
 *292
 
 turned him over to the police she would always have to look over her shoulder. He said she would only go home after he dragged her through the mountains, tied to his jeep, and then only if anyone could identify her.
 

 On May 14, 1992, Jenkins returned home and accused Hines of being sexually involved with another man. He picked up a two-by-four board and hit her in the face and on the head. He then swung from the door, kicked her with his mountain-climbing boots and hit her with a bottle. He took an iron pipe and jabbed her in the chest, ribs and arms. After he beat her, he choked her. Jenkins then took a .357 magnum and hit her on her body, arms and back with the barrel and butt of the handgun. He threw her on the bed, straddled her body, placed the gun at her ear and fired the weapon. The bullet grazed the side of her head and the heat from the shot caused her ear to turn inside out. The bullet left a hole above the headboard and in the wall next to the sink in the bathroom. Hines did not seek medical attention because Jenkins would not permit her to go to the hospital. When the police arrived she told them it was a family dispute and did not file a report.
 

 On May 28, 1992, Jenkins again beat Hines after accusing her of hiding his drugs. He arrived home and was unable to find the drugs, so he left to get some more. When he returned home, he shut the door, choked her and picked up a pipe. Jenkins then took a hammer and beat her on her knees and arms. He went outside, picked up a brick from the yard, and smashed it on her head and knees. Again Jenkins went outside. He told Hines to come outside, but she was unable to walk. Jenkins went inside, grabbed her, pulled her, and then choked her until she lost consciousness and control over her bowels and bladder. She regained consciousness as Jenkins was dragging her into the room. When she convinced him she had not hidden his drugs, he stopped. When the police arrived, Hines was getting cleaned up and dressed. She borrowed something to wear because Jenkins had cut up and thrown away most of her clothes. She told the officers she and Jenkins quarreled. Jenkins was arrested.
 

 Hines’s mother took her home and then to the hospital, where she was admitted and remained for eight days. Hines suffered a punctured lung, had trouble breathing and was on 100 percent oxygen. She had three to eight fractured ribs, a broken nose, swelling in both legs, and the wounds caused by the hammer and screwdriver jabs were infected. Her right leg was immobilized. After her release from the hospital, Hines went to a battered women’s shelter for 45 days. She is still undergoing medical treatment and has had to use a walker.
 

 Hines reviewed pictures and identified her injuries. She had circular scars on her body from pipe jabs and puncture marks on her legs from where
 
 *293
 
 Jenkins used a hammer and screwdriver, scars on her face where she had been hit by an ashtray and two-by-four board, and a cauliflower ear.
 

 Hines’s mother, Daisy Hines, was a registered nurse and a nurse educator at Long Beach City College. She testified that at approximately 3 p.m. on May 28, 1992, she received a call from Reverend Garvey to pick up her daughter who had almost been beaten to death. When she arrived at the house, she could only recognize her daughter’s voice. She then brought her to Memorial Hospital where she was admitted.
 

 Dr. Samuel Picone, Jr., was Hines’s attending physician at Memorial Hospital from May 28, 1992, through the first week in June 1992. He testified when Hines was admitted she had a history of blunt trauma with multiple soft tissue injuries, including a laceration over the right portion of her skull. Her right eye was swollen with blood around the cornea and she had a cauliflower ear. Hines had fractured ribs, a collapsed lung and a broken nose. Her leg was immobilized. Picone further testified a moderate to severe amount of force was required for blunt trauma to cause a broken rib. Hines had permanent scarring on her chest and legs. The semicircular injuries could possibly have been caused by a pipe.
 

 Detective Robert Ruegger testified he first interviewed Jenkins on May 29, 1992, after reading him his rights, which he waived. Jenkins told the officer he and Hines argued about her possible sexual relationship with his stepfather. He had become enraged and slapped her. Based on Jenkins’s statements and Hines’s reluctance to file a police report, Jenkins was released. Ruegger had not seen Hines until she contacted the officer, and the next day he visited her in the hospital. The officer noted Hines’s injuries were severe. Her head and body were covered with scars, cuts, abrasions and red marks. Her ear was red and swollen and appeared to be burned. Hines told him that during the argument Jenkins alternately struck her with his fists, a metal pole, a brick and a hammer.
 

 Ruegger prepared a supplemental report, which included the nature of Hines’s injuries. He notified deputies Jenkins was a suspect in the assault. On June 5,1992, he again interviewed Jenkins, who again waived his rights, and signed a waiver form. Jenkins told the officer the incident was a result of Hines’s alleged sexual involvement with his stepfather and her theft of his money. He wanted her to move out, but she had no other place to live. Jenkins said he hit her with his hand and a cylindrical object, possibly part of a child’s toy. He punched her in the ear, but did not fire a gun near her head. He had “ ‘whipped her ass’ ” on numerous occasions but did not hit her with a hammer or a brick.
 

 
 *294
 
 On June 22,1992, Ruegger served a search warrant on Jenkins’s residence where he found a bloody metal pipe, a tire wheel lock and some of Hines’s clothing. There was a bullet hole on the wall, and one through the headboard of the bed that went through the adjacent wall into the bathroom. The “ ‘big stick’ ” steering wheel locking device was found in Jenkins’s vehicle and identified by Hines as the one Jenkins used on her.
 

 Deputy Sheriff Michael Varvais arrested Jenkins on June 4, 1992. As Jenkins was getting into the patrol vehicle, Varvais told him he was charged with spousal assault. Jenkins replied, “ T know why I’m being arrested. She stole some money from me, so I . . . beat the shit out of her.’ ” After the booking process Jenkins made a telephone call and Varvais heard him say, “Mom, when I get out of jail, I’m going to kill that bitch.” Jenkins never indicated the charge was false.
 

 In Jenkins’s defense, his mother, Bonnie Jenkins, testified her residence was approximately 10 to 15 yards from where Hines and her son lived. She heard neither screams nor a gunshot come from their residence. As to the May 14,1992, incident, she heard Hines tell the police she was injured in the Los Angeles riots. On May 28, 1992, she noticed Hines had a black eye, but also observed she was wearing sunglasses and a baseball cap.
 

 Gale Garvey, Jenkins’s sister, testified she neither discussed her brother with Hines nor talked with Jenkins about Hines’s injuries, because it was none of her business. Prior to Jenkins’s arrest, she offered Hines fade cream to hide her scars.
 

 Deputy Sheriff Anthony Lucia responded to the incident at 67th Way at approximately 4:45 p.m. on May 28, 1992, and prepared the police report. He saw Hines crying and noticed injuries to her right eye, scratch marks on her right wrist and abrasions on her arms, neck and face. She told the officer she had been involved in a physical altercation with Jenkins after he returned home and found her having sex with another man. She did not want Jenkins arrested. Hines was uncooperative. She refused the officer’s request to take pictures and would not accept counseling or the phone number for shelters.
 

 Jenkins testified that on May 28, 1992 he returned home after doing volunteer work for the church and found Hines naked in bed and his stepfather coming out of the room. He left because he was hurt and went to talk to Garvey. Jenkins returned to the residence and told Hines since they were having problems she should leave. He told her he could not understand her having sex with his stepfather, and then a physical altercation ensued. Hines grabbed a small knife and jabbed him in the leg. Jenkins grabbed the
 
 *295
 
 knife and hit her approximately seven or eight times on the chest and the side of her head. He did not use a pipe, hammer or brick. He choked her, but she was not unconscious. After about three minutes, Jenkins left to seek counsel with his family. When he returned Hines told him every time he left his stepfather would come to see her.
 

 According to Jenkins, a neighbor heard screams and called the police. When the officers arrived he was sitting on the bed. Jenkins told the police he and Hines had a fight and he was arrested.
 

 On or about April 17, 1992, Jenkins returned home to find Hines in bed and noticed marks all over her body, but he did not inquire about the injuries. Three days later they had a misunderstanding over her scars and he slapped her. On or about April 29, 1992, Jenkins returned home to find a large quantity of liquor in the cabinet and Hines in bed. Hines told him she was injured taking the liquor from a store and the metal door she crawled under cut her legs.
 

 From April 29, 1992 to May 28, 1992, Jenkins and Hines continued to fight. On May 23, 1992, they argued about his stepfather and drugs. Jenkins hit her with his fists about five times in the lower portion of her stomach and grabbed her by the neck, scratching her with his nails. Jenkins never fired a gun near Hines’ head, or at her. He only hit her with his fists because he was big enough not to need “sticks and brooms.” When asked, “Now, how many times have you struck Mia,” Jenkins replied “Which time? The first time?” He beat her because she stole from him.
 

 Jenkins denied ever phoning his mother and telling her he would “kill the bitch.” He denied the statements Varvais attributed to him in the patrol car after he was rearrested. He denied kicking her while wearing mountain-climbing boots and explained he was only wearing soft leather motorcycle boots. He admitted going on the roof and watching Hines through spaces where he pulled back tiles. Jenkins further admitted each time he hit her there were bruises, and he could have broken her nose. He used his fist to hit her in the eye.
 

 At the close of testimony, the court and counsel reviewed jury instructions. Defense counsel requested, and the court permitted, instructions on lesser included charges of assault as to assault with a deadly weapon.
 

 After closing arguments, the court instructed the jury, in relevant part, on inferences from direct and circumstantial evidence (CALJIC No. 2.00), the sufficiency of circumstantial evidence (CALJIC 2.01), sufficiency of circumstantial evidence to prove specific intent (CALJIC No. 2.02), credibility
 
 *296
 
 of witnesses (CALJIC No. 2.20), sufficiency of one witness’s testimony (CALJIC No. 2.27 (1991 rev.)), and the elements and definitions of spouse or cohabitant beating, torture, and intentional infliction of great bodily harm (CALJIC Nos. 9.35 (1989 re-rev.), 9.90 (1991 new), 17.20).
 

 The jury deliberated one and one-half days and returned with guilty verdicts on one count of corporal injury to a cohabitant, two counts of assault with a deadly weapon, two counts of torture, one count of mayhem, one count of a possession of a firearm by a felon, and true findings on the great bodily injury and use of a deadly weapon enhancements.
 

 On October 6, 1992, Jenkins received two consecutive life sentences on the torture counts, a consecutive eight-month sentence for possession of a firearm by a felon, and a one-year consecutive sentence for the use of a deadly weapon enhancement. The court dismissed three counts and one firearm-use allegation pursuant to section 1385. The remaining counts were stayed.
 

 On October 6, 1992, Jenkins filed a notice of appeal.
 

 Ill
 

 Contentions
 

 Jenkins contends:
 

 (1) Penal Code section 206 is unconstitutionally vague and overbroad and violated principles of due process;
 

 (2) there was insufficient evidence to support the torture verdict;
 

 (3) the trial court committed instructional error; and
 

 (4) the trial court committed sentencing error.
 
 [2]
 

 
 *297
 
 IV
 

 Discussion
 

 A., B.
 
 *
 

 C.
 
 The Trial Court Did Not Commit Instructional Error
 

 (1)
 
 Standard of Review
 

 We examine instructions to determine whether the law was correctly conveyed to the jury.
 
 (People
 
 v.
 
 Kelly
 
 (1992) 1 Cal.4th 495, 525 [3 Cal.Rptr.2d 677, 822 P.2d 385].) “Once we have ascertained the relevant law, we determine the meaning of the instructions in this regard. Here the question is whether there is a ‘reasonable likelihood’ that the jury understood the charge .... [Citations.] ‘In addressing this question, we consider the specific language under challenge and, if necessary, the charge in its entirety. [Citation.] Finally, we determine whether the instruction, so understood, states the applicable law correctly.’ [Citation.]”
 
 {Id.
 
 at pp. 525-526.)
 

 “ ‘The general rule is that the trial court must instruct the jury on the general principles of law relevant to the issues raised by the evidence, even though not requested to do so, but need not instruct on its own motion on specific points developed at the trial.’ [Citation.]”
 
 (People
 
 v.
 
 Harris
 
 (1989) 47 Cal.3d 1047, 1096 [255 Cal.Rptr. 352, 767 P.2d 619].)
 

 (2)
 
 CALJIC No. 9.90*
 

 (3)
 
 CALJIC No. 17.01
 

 Jenkins’s contention the trial court committed reversible error in failing to instruct sua sponte that the jury must unanimously agree on the particular act constituting the basis for its guilty verdict on each count charging the crime of torture is not well taken. Jenkins admits, and the record supports the conclusion, the alleged acts were committed in a continuous course of conduct. We find this case falls within the continuous course of conduct exception to the unanimity instruction.
 

 
 *298
 
 The jury was instructed it could find Jenkins guilty of two counts of torture if he inflicted great bodily harm on Hines with the specific intent to cause cruel or extreme pain for a coersive purpose on two specified occasions, May 14, 1992, and May 28, 1992.
 

 On May 14, 1992, Jenkins hit Hines with an iron or steel pipe, beat her in the face with a two-by-four board, kicked her with his mountain-climbing boots, choked her, pistol-whipped her and then fired a .357 magnum revolver next to her head. On May 28, 1992, Jenkins repeatedly beat Hines with a hammer, pole and brick. He dragged her outside and choked her into unconsciousness. Jenkins admitted beating and choking Hines, but argued he did so in a jealous rage, she was never unconscious, and he only used his fists.
 

 Jenkins now argues (1) the mistrial on counts of aggravated mayhem, false imprisonment, and terrorist threats is evidence the jury disagreed as to the acts committed, and (2) the jury could have disagreed as to which acts constituted torture, given the number and variety of assaults to which Hines testified. The problem of which he complains arises “in cases where violation of a criminal statute is charged and the evidence establishes several acts, any one of which could constitute the crime charged.”
 
 (People
 
 v.
 
 Thompson
 
 (1984) 160 Cal.App.3d 220, 223 [206 Cal.Rptr. 516]; see
 
 People
 
 v.
 
 Diedrich
 
 (1982) 31 Cal.3d 263 [182 Cal.Rptr. 354, 643 P.2d 971].)
 

 The jury was not given CALJIC No. 17.01, the standard unanimity instruction, which provides: “The defendant is accused of having committed the crime of_(in Count_). The prosecution has introduced evidence tending to prove that there is more than one (act) (or) (omission) upon which a conviction (on Count_) may be based. Defendant may be found guilty if the proof shows beyond a reasonable doubt that (he) (she) committed any one or more of such (acts) (or) omissions). However, in order to return a verdict of guilty (to Count_), all jurors must agree that (he) (she) committed the same (act) (or) (omission) (or (acts) (or) (omissions). It is not necessary that the particular (act) (or) (omission) agreed upon be stated in your verdict.” (CALJIC No. 17.01 (5th ed.) p. 425.)
 

 Our discussion of jury unanimity begins with the “constitutionally based concept that ‘the defendant is entitled to a verdict in which all 12 jurors concur, beyond a reasonable doubt, as to each count charged.’
 
 (People
 
 v.
 
 Jones
 
 (1990) 51 Cal.3d 294, 305 .. . .)”
 
 (People
 
 v.
 
 Melendez
 
 (1990) 224 Cal.App.3d 1420, 1427-1428 [274 Cal.Rptr. 599].) “From this constitutional underpinning, four principles have emerged. First, if the prosecution shows several acts and each act is a separate offense, a unanimity instruction is required.”
 
 (Id.
 
 at p. 1428.) “The second established principle is that a
 
 *299
 
 unanimity instruction is not required when the case falls within the continuous course of conduct exception.”
 
 {Ibid.)
 
 “Analogous to the single course of conduct exception is the third established principle, that the failure to give CALJIC No. 17.01 is harmless when disagreement by the jury is not reasonably probable. [Citation.]”
 
 {Id.
 
 at p. 1430.) “The fourth principle applicable to the question whether unanimity instructions are required is that the jury is not required to agree on the specific ‘theory’ of guilt. [Citation.]”
 
 {Id.
 
 at p. 1432.)
 

 The continuous course of conduct exception arises in two contexts. (224 Cal.App.3d at p. 1428;
 
 People
 
 v.
 
 Thompson, supra,
 
 160 Cal.App.3d at p. 224.) “The first is when the acts are so closely connected that they form part of one and the same transaction, and thus one offense. [Citation.] The second is when ... the statute contemplates a continuous course of conduct of a series of acts over a period of time. [Citation.]”
 
 {People
 
 v.
 
 Thompson, supra,
 
 160 Cal.App.3d at p. 224.)
 

 The court in
 
 People
 
 v.
 
 Madden
 
 (1981) 116 Cal.App.3d 212 [171 Cal.Rptr. 897] determined the exception should be narrowly drawn and stated: “Conceptually, the exception of continuous conduct resulting in but one offense is quite limited. There is a fundamental difference between a continuous crime spree and continuous conduct resulting in one specific offense. The continuous conduct exception only really applies, if at all, to those types of offenses where the statute defining the crime may be interpreted as applying, on occasion, to an offense which may be continuous in nature such as failure to provide, child abuse, contributing to the delinquency of a minor, driving under the influence and the like [citations].”
 
 {Id.
 
 at p. 218.)
 

 Additionally, “[t]he ‘continuous course of conduct’ exception—when the acts are so closely connected that they form one transaction—is meant to apply not to all crimes occurring during a single transaction but only to those ‘where the acts testified to are so closely related in time and place that the jurors reasonably must either accept or reject the victim’s testimony in toto.’ [Citation.]”
 
 {People
 
 v.
 
 Melendez, supra,
 
 224 Cal.App.3d at pp. 1429-1430.)
 

 The continuous course of conduct exception has been “applied to varying crimes that cover ‘ “repetitive or continuous conduct” ’ [citation] such as child abuse [citations]; misdemeanor child annoyance or molestation [citations]; pimping [citation]; pandering [citation]; failure to provide for a minor child [citation]; contributing to the delinquency of a minor [citation]; and dissuading a witness from testifying [citation].”
 
 {People
 
 v.
 
 Gear
 
 (1993) 19 Cal.App.4th 86, 92 [23 Cal.Rptr.2d 261].)
 

 In
 
 People
 
 v.
 
 Thompson, supra,
 
 “the continuous-course-of-conduct exception was applied to spousal battering”
 
 {People
 
 v.
 
 Gear, supra,
 
 19
 
 *300
 
 Cal.App.4th at p. 92) because, “[l]ike child abuse, this is a case where each individual act may not amount to a crime, but the cumulative outcome is criminal.”
 
 (People
 
 v.
 
 Thompson, supra,
 
 160 Cal.App.3d at p. 225.) The court found “[b]oth the victim of spousal and of child abuse are likely to be unwilling to report their abuse to the authorities due to fear of physical and/or emotional retaliation on the part of the attackers. Both patterns of behavior are based on controlling another individual through violence.”
 
 (Id.
 
 at p. 226.)
 

 Considering the nature of torture and the facts of this case, we find the underlying rationale for the exception supports its application to torture. The record reflects the beatings and abuse repeatedly took place over a six-month period. “The
 
 actus reus
 
 of such a crime is a
 
 series
 
 of acts occurring over a substantial period of time, generally on the same victim and generally resulting in cumulative injury.”
 
 (People
 
 v.
 
 Jones
 
 (1990) 51 Cal.3d 294, 329 [270 Cal.Rptr. 611, 792 P.2d 643] (dis. opn. of Mosk, J.)) Additionally, the incidents of May 14, 1992, and May 28, 1992, each involved a beating that consisted of assaults with fists, boots, a pipe, a hammer, a choking, and a gun shot near the victim’s head, within a specifically defined period of time. The acts were closely related in time and place. Under either analysis, the continuous course of conduct exception was applicable, and the trial court was not required to instruct the jury sua sponte with CALJIC No. 17.01.
 

 D. E.
 
 *
 

 V.
 

 Disposition
 

 The judgment of conviction is affirmed. The one-year enhancement for use of a deadly weapon (§ 12022, subd. (b)) is ordered stricken. The cause is remanded for resentencing in conformance with this opinion.
 

 Klein, P. J., and Croskey, J., concurred.
 

 Appellant’s petition for review by the Supreme Court was denied February 1, 1995.
 

 [1]
 

 Unless otherwise indicated, all further statutory references are to the Penal Code.
 

 [2]
 

 With permission of the court, Jenkins filed a supplemental brief contending he was deprived of due process by the use of CALJIC No. 2.90 which defines reasonable doubt with reference to “moral evidence” and “moral certainty.” On September 28, 1993, the United States Supreme Court granted certiorari on the issue of the constitutionality of this reasonable doubt instruction in
 
 Sandoval
 
 v.
 
 California
 
 (1993)_ U.S. _ [125 L.Ed.2d 789, 114 S.Ct. 40]). Jenkins’s challenge to CALJIC No. 2.90 is rejected on the ground that on March 22, 1994, the United States Supreme Court upheld the constitutionality of the reasonable doubt instruction in
 
 Victor
 
 v.
 
 Nebraska
 
 (1994) _ U.S. _ [127 L.Ed.2d 583, 114 S.Ct. 1239].
 

 *
 

 See footnote,
 
 ante,
 
 page 287.
 

 *
 

 See footnote,
 
 ante,
 
 page 287.