Filed 5/5/14  P. v. Lewis CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D063121 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. JCF26439) |
| DAVID BRIAN LEWIS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Imperial County, Ruth Bermudez Montenegro, Judge.  Reversed.

John L. Staley, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and James H. Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted David Brian Lewis of eight counts of insurance fraud in connection with workers' compensation benefits that he received during two different time periods (Ins. Code, § 1871.4, subd. (a)(1) [counts 1, 6]; *id*., § 1871.4, subd. (a)(2) [counts 2, 7]; Pen. Code, § 550, subd. (a)(1) [count 3]; *id*., § 550, subd. (b)(3) [counts 4, 9]; *id*., § 550, subd. (a)(5) [count 8]) and one count of grand theft of personal property (Pen. Code, § 487, subd. (a) [count 10]). The jury further found that with respect to five of the counts, Lewis had taken benefits exceeding $65,000 (*id*., § 12022.6).

The trial court placed Lewis on five years' formal probation, with the condition that he serve 30 days in jail and pay restitution in the total amount of $145,904.93.

Lewis challenges the judgment, arguing that the trial court prejudicially erred in (1) not giving a unanimity instruction to the jury; (2) admitting evidence of Lewis's past workers' compensation claims; and (3) not instructing the jury, sua sponte, on the meaning of "common scheme or plan" in Penal Code section 12022.6, subdivision (b). We conclude that the trial court prejudicially erred in not giving a unanimity instruction, and we accordingly reverse the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

Lewis was employed by the California Department of Corrections at Centinela State Prison starting in 1998, where he worked most recently as a plumber. During the course of his employment, Lewis filed several claims for workers' compensation

2

benefits.[1]  In the instant proceeding, Lewis was prosecuted for insurance fraud concerning claims arising from an injury to his left arm in 2006 and an injury to his heels that he reported in 2009.

A.    *The 2006 Claim*

On October 24, 2006, Lewis filled out a workers' compensation claim form reporting an injury that occurred at work on September 16, 2006, when he hit his left hand while using pliers and developed soreness in his forearm.  The claim was forwarded to the State Compensation Insurance Fund (SCIF), which is the workers' compensation claims administrator for Centinela State Prison.

After reporting the injury, Lewis was treated by a number of doctors through the workers' compensation system.  First, Lewis was examined by Dr. Perry W. Beal, Jr., who diagnosed left lateral epicondylitis, commonly referred to as tennis elbow, and placed Lewis on modified work duty, restricting him from pinching or palmar grasping with his left hand.  After Lewis exhausted the 60-day light duty work assignment provided by the prison, he was off work for the duration of his arm injury.

Despite physical therapy and medication, Lewis continued to complain of discomfort in his elbow when pulling, lifting or twisting.  Dr. Beal referred Lewis to an

---

[1]    According to the record, in addition to the two workers' compensation claims at issue in this case, Lewis made a claim for (1) an ankle injury in January 2000, which was denied; (2) an eye injury in June 2000, which was approved; (3) a groin injury in July 2000, which was approved; (4) work-related stress in October 2000, which was denied; and (5) a back injury in July 2005, for which he was off work for a few days and placed on light duty.

orthopedic surgeon, Dr. Christopher Lai, for evaluation of surgical options. In January 2007, Dr. Lai diagnosed left lateral epicondylitis and treated Lewis with injections. After treatment by Dr. Lai, the epicondyle pain abated, but Lewis developed pain in the musculature of his left forearm.

Dr. Lai referred Lewis to the care of an upper extremity specialist, Dr. William Davidson, who examined Lewis in June 2007. Lewis reported to Dr. Davidson that he had pain in his forearm upon forceful grasping or gripping or upon reaching forward and lifting a light object with an extended elbow, and he was unable to grasp objects as light as a large drinking glass without severe pain. Dr. Davidson diagnosed radial tunnel syndrome in the left forearm and performed surgery on Lewis in September 2007. After a period of recovery, Lewis was released by Dr. Davidson to return to work in January 2008 with no restrictions. In March 2008, Dr. Davidson reported that both the lateral epicondylitis and the radial tunnel syndrome had been treated and cured with no resulting disability or impairment.

During the period when he was experiencing problems with his left arm, Lewis obtained benefits through the workers' compensation system. He obtained $39,339.30 in industrial disability leave through the prison, and $15,671.86 in benefits from SCIF.

Unbeknownst to his treating doctors, Lewis had a previous diagnosis of epicondylitis. In July 2000, Lewis reported to his family doctor, Dr. Benjamin Lehr, that he was having pain in the arms, neck and shoulder. Upon examination, Dr. Lehr determined that Lewis was suffering from epicondylitis. According to Dr. Lehr's

4

testimony, epicondylitis is a chronic condition that rarely goes away by itself, and symptoms will return each time it is aggravated.

Despite general questions about Lewis's previous injuries and medical conditions during the patient intake process at Dr. Beal's office and Dr. Lai's office, Lewis did not disclose that he had been previously diagnosed with epicondylitis. Dr. Davidson was also unaware of Lewis's prior treatment for epicondylitis.

While Lewis was off work because of the arm injury, coworkers noticed and reported certain activity by Lewis that they suspected to be inconsistent with Lewis's claimed arm injury. In late 2006 or early 2007, a coworker saw Lewis driving his truck on a bumpy dirt road using his left hand. A coworker also noticed a photo of Lewis displayed at a gas station, in which Lewis was using his left hand to hold up a large fish that he caught in September 2007. Another coworker drove past Lewis's house in March 2007 and observed Lewis getting his trailer ready to transport his all-terrain vehicles on a camping trip.

B.    *The 2009 Claim*

On August 25, 2009, after having been back to work for approximately a year and a half following recovery from his arm injury, Lewis submitted an injury report and a workers' compensation claim form stating that he had a cumulative trauma injury to his left and right heels.

A few months before filing the claim form in August 2009, Lewis started visiting his private physician, Dr. Cyril Gostich, about his heel pain. Dr. Gostich diagnosed

plantar fasciitis and plantar calcaneal spurring or stress fracture, and he treated Lewis with injections.

After Lewis filed the workers' compensation claim, he was examined by Dr. Frederick Arbenz in August 2009, who diagnosed plantar fasciitis on both feet. Dr. Arbenz put Lewis on modified work duty, if available, and restricted him from repetitive standing or walking. After the pain had not improved upon a follow-up visit, Dr. Arbenz referred Lewis to a podiatrist, Dr. Jeremiah Maloney, in September 2009.

Dr. Maloney prescribed custom-made orthotics for Lewis's feet, which Lewis starting using in January 2010. The orthotics did not resolve the heel pain, and Dr. Maloney performed surgery on Lewis's left foot on February 26, 2010. Dr. Maloney released Lewis to return to work in mid-July 2010.

After being back at work for a few months, Lewis visited Dr. John Lane in October 2010. As stated in Dr. Lane's report, Lewis reported "continued symptoms" and "present[ed] for orthopedic assessment for change in treating physician after having obtained legal representation." Lewis reported "ongoing bilateral heel pain," with more pain in the left foot. Dr. Lane prescribed a course of physical therapy. Over the months of treatment by Dr. Lane, Lewis's condition worsened. Dr. Lane concluded that Lewis still had significant pain and was no longer able to perform his job duties as a plumber, which required prolonged standing and walking on a continuous basis. In August 2011, Dr. Lane determined that Lewis's condition was permanent and stationary and that Lewis was unable to return to his normal occupation. Dr. Lane concluded that Lewis had a "15% whole person impairment," and he apportioned 100 percent of the impairment to

industrial injury, as there was "no substantial evidence for apportionment to preexisting, underlying or nonindustrial factors."

The workers' compensation benefits that Lewis obtained in connection with the injury to his heels included $51,494.67 in industrial disability leave from the prison and benefits of at least $31,118.59 paid by SCIF.

Unbeknownst to his treating doctors in the workers' compensation system, Lewis had a previous history with plantar fasciitis and heel spurs. In June 1999, he reported to Dr. Lehr that he was having pain in his left foot, and he was referred to Dr. Gostich for further evaluation. Dr. Gostich examined Lewis in 1999 and diagnosed bilateral plantar fasciitis. A radiology report in 1999 showed some spurring of the plantar aspect of the calcaneus. Lewis told Dr. Gostich in 1999 that he had been having heel pain for the past 15 years. Dr. Gostich testified that the heel pain Lewis complained of in 2009 was "most probably" from the same plantar fasciitis condition that was diagnosed in 1999.

Lewis was asked when he first visited Dr. Arbentz's office in August 2009 whether he had any significant past medical history and specifically any previous foot injury. He did not disclose the prior problems with his heels. Dr. Arbentz's report after his first examination of Lewis stated, "Mr. Lewis states that he has no outside activities that are causative or aggravating the situation. He has not had any prior ankle or foot injuries of any significance, other than an occasional ankle sprain as a youth, none of which are persistent and none of which have required treatment." Lewis also did not report his prior problem with plantar fasciitis to Dr. Lane, choosing to report only a prior left elbow injury and prior fractures of his toes and fingers.

7

At trial, the People introduced evidence of certain activities that Lewis engaged in while being treated for heel pain that may have been inconsistent with his condition. Among other things, the jury heard evidence that during the period 2008 to 2012, Lewis was participating in a bowling league.

C. *The Criminal Proceedings Against Lewis*

After investigations were conducted, Lewis was charged with insurance fraud based on his 2006 claim and his 2009 claim.

Lewis was charged with five counts for the insurance fraud alleged to have occurred between September 19, 2006, and March 31, 2008, in connection with the workers' compensation claim arising from his arm injury, and five additional counts for the insurance fraud alleged to have occurred between August 24, 2009, to November 30, 2011, relating to his heel injury.

Specifically, for both time periods, Lewis was charged with (1) making or causing to be made a false or fraudulent material statement or representation to obtain workers' compensation benefits (Ins. Code, § 1871.4, subd. (a)(1) [counts 1, 6]); (2) presenting or causing to be presented a knowingly false or fraudulent written or oral material statement representation to obtain workers' compensation benefits (*id*., § 1871.4, subd. (a)(2) [counts 2, 7]); (3) concealing or knowingly failing to disclose an occurrence affecting entitlement to benefits (Pen. Code, § 550, subd. (b)(3) [counts 4, 9]); and (4) grand theft of personal property by false pretenses (*id*., § 487, subd. (a) [counts 5, 10]). In addition, for the earlier time period, Lewis was charged with presenting a false or fraudulent claim for payment of a loss or injury (*id.*, § 550, subd. (a)(1) [count 3]), and for the later time

8

period, Lewis was charged with making a writing in support of a false or fraudulent claim (*id.*, § 550, subd. (a)(5) [count 8]). For each of the counts arising from the later time period, the information alleged pursuant to Penal Code section 12022.6, subdivision (a)(1) that Lewis took property exceeding $65,000 in value.

After a month-long trial, a jury found Lewis guilty on all counts except for count 5, which alleged grand theft of personal property in connection with the earlier time period. The jury also made true findings for counts 6 through 10 that Lewis took insurance benefits resulting in a loss in excess of $65,000 (Pen. Code, § 12022.6).

The trial court placed Lewis on five years' formal probation. The trial court also ordered Lewis to serve 30 days in jail and pay restitution of $54,470.87 to the State of California, Division of Workers' Compensation and $91,434.06 to Centinela State Prison.

II

DISCUSSION

A.    *The Trial Court Erred in Not Providing an Instruction on Unanimity*

Defense counsel requested that the trial court instruct the jury on the requirement that the jury reach a unanimous decision as to which acts Lewis committed in violation of each count.[2] The trial court declined to give the instruction, stating that the instruction

---

[2]    The applicable unanimity instruction is contained in Judicial Council of California Criminal Jury Instructions (2012), CALCRIM No. 3500. "The defendant is charged with _____ *<insert description of alleged offense>* [in Count ___] [sometime during the period of _____ to _____]. [¶] The People have presented evidence of more than one act to prove that the defendant committed this offense. You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act (he/she) committed."

9

was not needed "when there is a continuous course of conduct." Lewis contends that the trial court prejudicially erred in declining to deliver a unanimity instruction. As we will explain, we agree.

1.     *Standard of Review*

" '[A]ssertions of instructional error are reviewed de novo.' [Citation.] Whether or not the trial court should have given a 'particular instruction in any particular case entails the resolution of a mixed question of law and fact,' which is 'predominantly legal.' [Citation.] As such, it should be examined without deference." (*People v. Hernandez* (2013) 217 Cal.App.4th 559, 568 (*Hernandez*).)

2.     *The Applicable Law*

The requirement that the jury be instructed on unanimity in certain cases is based on the principle that "[i]n a criminal case, a jury verdict must be unanimous." (*People v. Russo* (2001) 25 Cal.4th 1124, 1132 (*Russo*).) "[C]ases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act. [Citations.] [¶] This requirement of unanimity as to the criminal act 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.' " (*Ibid*.)

"A unanimity instruction is required only if the jurors could otherwise disagree which act a defendant committed and yet convict him of the crime charged." (*People v. Maury* (2003) 30 Cal.4th 342, 423 (*Maury*).) "[T]he unanimity instruction is appropriate 'when conviction on a single count could be based on two or more discrete criminal

10

events,' but not 'where multiple theories or acts may form the basis of a guilty verdict on one discrete criminal event.' [Citation.] In deciding whether to give the instruction, the trial court must ask whether (1) there is a risk the jury may divide on two discrete crimes and not agree on any particular crime, or (2) the evidence merely presents the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime. In the first situation, but not the second, it should give the unanimity instruction." (*Russo*, *supra*, 25 Cal.4th at p. 1135.) "A requirement of jury unanimity typically applies to acts that could have been charged as separate offenses." (*Maury*, at p. 423.)

As relevant here, " 'a unanimity instruction is not required when the case falls within the continuous course of conduct exception.' " (*People v. Jenkins* (1994) 29 Cal.App.4th 287, 298-299 (*Jenkins*).) "The continuous course of conduct exception arises in two contexts. [Citation.] ' "The first is when the acts are so closely connected that they form part of one and the same transaction, and thus one offense. [Citation.] The second is when . . . *the statute* contemplates a continuous course of conduct of a series of acts over a period of time." ' " (*Hernandez*, *supra*, 217 Cal.App.4th at p. 572.)

B.      *A Unanimity Instruction Was Required*

Based on the pertinent legal principles, our central inquiry in examining the applicability of the unanimity instruction is whether there was a risk that the jury would convict Lewis without agreeing on any particular discrete criminal event. To analyze that issue we will focus on the People's theory of guilt as presented to the jury. The prosecutor's closing argument generally divided the misrepresentations made by Lewis

11

into those made in connection with the 2006 claim and those made in connection with the 2009 claim. Our discussion will proceed accordingly.

            1.       *The Prosecutor Argued Several Distinct Alleged Misrepresentations to Support the Counts Arising from the 2006 Workers' Compensation Claim*

Arising from the 2006 workers' compensation claim regarding his arm injury, Lewis was convicted of four insurance fraud claims: (1) making or causing to be made a false or fraudulent material statement or representation (Ins. Code, § 1871.4, subd. (a)(1)); (2) presenting or causing to be presented a knowingly false or fraudulent written or oral material statement representation (*id*., § 1871.4, subd. (a)(2)); (3) concealing or knowingly failing to disclose an occurrence affecting entitlement to benefits (Pen. Code, § 550, subd. (b)(3)); and (4) presenting a false or fraudulent claim for payment of a loss or injury (*id.*, § 550, subd. (a)(1)). The verdict forms directed the jury to a wide time frame for the four counts, stating that each of the crimes took place "between the 19th day of September 2006 and the 31st day of March 2008."

During closing argument, the prosecutor did not attempt to distinguish between the four counts in describing the evidence, and instead took the general approach of suggesting several different misrepresentations or omissions that Lewis made between September 2006 and March 2008 in connection with the 2006 workers' compensation claim.

First, the prosecutor argued that Lewis made misrepresentations to the first two doctors he saw for his arm injury — Dr. Beal and Dr. Lai — when they asked for his medical history. Specifically, the prosecutor argued that Lewis failed to disclose to either

12

Dr. Beal or Dr. Lai that he was diagnosed with epicondylitis in 2000, and also failed to disclose some of his other prior industrial injuries. The prosecutor argued, "He has preexisting conditions, which he took advantage of. And he didn't tell anybody because he knew how to manipulate the system."

Second, the prosecutor put forth a different argument as to the misrepresentations that Lewis made to the third doctor he saw for his arm injury, Dr. Davidson. The prosecutor argued that the evidence showed that by the time Dr. Davidson examined Lewis in June 2007, the epicondylitis that had purportedly developed as a result of Lewis's September 2006 workplace accident had been treated and cured. According to the prosecutor, the radial tunnel syndrome that Dr. Davidson diagnosed and treated was a completely *different* condition, which was not an industrial injury because it first arose in mid-2007 while Lewis was off work on temporary disability. The prosecutor argued that Lewis made a fraudulent misrepresentation by leading Dr. Davidson to believe that the radial tunnel syndrome injury was the same injury that was already successfully treated by Dr. Lai. Specifically, referring to the radial tunnel syndrome, the prosecutor argued that Lewis "le[d] Dr. Davidson to believe it was work-related."

Finally, the prosecutor suggested that Lewis lied about the extent of the injury to his arm, stating, "If he has absolutely no injuries, . . . then everything he is saying about his injuries is a misrepresentation. We come close to that in the 2006 case. . . . We're real close to no injury here at all." The prosecutor argued, "He can't go to work because of all of these restrictions, but he can play. He can go out there and play, and do all those outside activities."

13

Because each category of misrepresentation was based on specific facts and different theories as to why the statements were untrue, Lewis asserted different defenses as to each of the categories of alleged misrepresentations. For example, one of Lewis's central defenses to the claim that he failed to disclose his previous diagnoses was that the omissions were not material. In contrast, in defending against the claim that he was not actually in pain, as evidenced by his participation in outside recreational activities, Lewis argued that his coworkers did not accurately describe what they saw him doing, and that, in any event, the activities he participated in were not precluded by his disabilities.

2. *The Prosecutor Argued Several Distinct Alleged Misrepresentations to Support the Counts Arising from the 2009 Workers' Compensation Claim*

The convictions arising from the 2009 workers' compensation claim regarding Lewis's heel injury consisted of four insurance fraud counts: (1) making or causing to be made a false or fraudulent material statement or representation (Ins. Code, § 1871.4, subd. (a)(1)); (2) presenting or causing to be presented a knowingly false or fraudulent written or oral material statement representation (*id.*, § 1871.4, subd. (a)(2)); (3) concealing or knowingly failing to disclose an occurrence affecting entitlement to benefits (Pen. Code, § 550, subd. (b)(3)); and (4) making a writing in support of a false or fraudulent claim (*id.*, § 550, subd. (a)(5)). The 2009 workers' compensation claim also gave rise to a conviction for grand theft under the theory that Lewis used a false pretense to obtain monetary benefits. (*Id.*, § 487, subd. (a).) The verdict forms directed the jury to a wide time frame for the five counts, stating that each of the crimes took place "on or

14

about the 24th day of August of 2009 through and including the 30th day of November of 2011."

The prosecutor's closing argument suggested more than one way in which Lewis made misrepresentations in connection with the 2009 workers' compensation claim.

First, the prosecutor pointed out that Lewis was asked about his medical history by both Dr. Arbenz and Dr. Lane, but on neither occasion did Lewis disclose that he had already been diagnosed with plantar fasciitis in 1999.

Second, the prosecutor argued that Lewis made misrepresentations when he failed to disclose to Dr. Arbenz that he engaged in outside activities, i.e., bowling and off-road vehicle riding, that could cause or exacerbate his heel injury.

Finally, the prosecutor suggested that Lewis might be exaggerating his symptoms of heel pain and the resulting disability for the purpose of obtaining workers' compensation benefits. The prosecutor stated, "I argue to you that Costco has asphalt, WalMart has asphalt. The roads have asphalt. You saw him walking around his house on cement driveway. . . . He can do anything he wants outside of work. But he can't do these while inside of work. That's what I am arguing to you. These are misrepresentations. . . . Dr. Davidson said pretty much don't expect him to do it outside of work if it's hurting him. So the question now in your mind, is it really hurting him?"

As was the case with the alleged misrepresentation arising from the 2006 workers' compensation claim, Lewis set forth different defenses to the different categories of misrepresentations that he allegedly made in connection with the 2009 workers' compensation claim.

15

3. *There Was a Risk for Each Count That the Jurors Would Not Agree on the Same Criminal Event in Finding Lewis Guilty*

Although the statutes under which Lewis was charged contain slightly different elements, they all generally require a finding that Lewis made either a misrepresentation or omission in connection with an attempt to obtain insurance benefits.[3] As we will explain, because the prosecutor relied on a variety of different alleged misrepresentations and omissions to argue for Lewis's guilt, there was risk that the jury would disagree on which discrete misrepresentation or omission by Lewis supported a finding of guilt.

First, with respect to the counts arising from the 2006 arm injury, the jury was presented with several discrete events occurring at different times that could have led to a finding that Lewis made a misrepresentation or omission to obtain insurance benefits. A juror could have focused on (1) Lewis's statements to Dr. Beal in October 2006 about his past medical history, omitting the past diagnosis of epicondylitis; (2) Lewis's statements to Dr. Lai in January 2007, also omitting mention of the past diagnosis; (3) any of Lewis's representations to Dr. Davidson, starting in June 2007, about his radial tunnel syndrome symptoms that would have suggested the injury was work-related; or (4) any of

_____

[3] Based on the jury instructions, the jury was required to make the following findings for each of the specific statutes under which Lewis was charged: Insurance Code section 1871.4, subdivisions (a)(1) and (a)(2) required a finding that Lewis made or caused to be made a false or fraudulent statement; Penal Code section 550, subdivision (a)(1) required a finding that Lewis presented or caused to be presented a false or fraudulent claim; Penal Code section 550, subdivision (b)(3) required a finding that Lewis failed to disclose an event affecting an insurance benefit; Penal Code section 550, subdivision (a)(5) required a finding that Lewis prepared, made or signed a document in support of a false or fraudulent claim; and the count alleging grand theft by false pretenses (Pen. Code, § 487) required a finding that Lewis made a false representation.

16

Lewis's various statements to his doctors throughout his treatment for his arm injury that exaggerated his pain, symptoms and disability. As these are very different types of alleged misrepresentations, each involving distinct evidence, and each involving different defenses, one juror could have decided that one of the alleged misrepresentations supported a finding of guilt, while another juror could have focused on a completely different one.

Second, the same problem arises with respect to the misrepresentations and omissions put forth by the prosecutor as a basis for the counts arising from Lewis's 2009 heel injury. The jury could have made findings of insurance fraud in that time period based on (1) Lewis's failure to disclose to Dr. Arbenz in August 2009 that he had previously been diagnosed with plantar fasciitis; (2) Lewis's failure to disclose that same previous diagnosis to Dr. Lane in October 2010; (3) Lewis's failure to disclose to Dr. Arbenz that he participated in outside activities that could have caused or exacerbated his heel injury; or (4) any of Lewis's statements during his treatment for his heel injury that might have overstated the extent of his pain and disability. As with the alleged misrepresentations and omissions in the earlier time period, these alleged misrepresentations and omissions each involve distinct evidence and different defenses, creating a risk that one juror would find Lewis guilty based on one of the alleged misrepresentations, while another juror relied on a wholly different misrepresentation.

Further, as we have explained, "[a] requirement of jury unanimity typically applies to acts that could have been charged as separate offenses." (*Maury*, *supra*, 30 Cal.4th at p. 423.) Here, Lewis could have been charged in separate counts for each distinct

17

misrepresentation instead of grouping the misrepresentations together in counts spanning two extended time periods. (See *People v. Gillard* (1997) 57 Cal.App.4th 136, 148-150 [defendant charged with separate counts under Ins. Code, § 1871.4, subd. (a), all arising out of the same workers' compensation claim, for (1) a false statement to a doctor in October 1993 denying a prior knee injury; (2) a statement to the same doctor in March 1994 denying a prior knee injury; and (3) a statement to a different doctor in April 1994 denying a prior knee injury]; *People v. Zanoletti* (2009) 173 Cal.App. 547, 559, 560 (*Zanoletti*) [because insurance fraud under Pen. Code, § 550 "is concerned with the means, not the end," separate criminal violations occurred upon separately statutorily proscribed acts, even if the acts were pursuant to "a general scheme to present fraudulent insurance claims"].)

It is also significant that early in their deliberations, the jurors sent a note to the trial court asking, "Explain the different counts." This suggests that the jury was likely quite confused by the prosecutor's failure to specify which of Lewis's many different representations over the course of his treatment were materially false and made with an intent to defraud and corresponded to each of the 10 counts alleged against Lewis. In light of the jury's confusion about the counts charged against Lewis, there is more than a theoretical possibility that different jurors were focused on different acts as supporting the different counts alleged against Lewis.

Under these circumstances, when (1) a " 'conviction on a single count could be based on two or more discrete criminal events' "; (2) "there is a risk the jury may divide on two discrete crimes and not agree on any particular crime" (*Russo*, *supra*, 25 Cal.4th

18

at p. 1135); and (3) the separate misrepresentations could be charged as separate crimes, the trial court was required to give a unanimity instruction unless — as the People contend — this case falls into the continuous course of conduct exception.

4. *The Continuous Course of Conduct Exception Does Not Apply*

i. *The Alleged Misrepresentations Are Not So Closely Connected in Time and Place That They Form Part of One and the Same Transaction*

The first instance in which the continuous course of conduct exception applies is " ' "when the acts are so closely connected that they form part of one and the same transaction, and thus one offense." ' " (*Hernandez*, *supra*, 217 Cal.App.4th at p. 572.) "This aspect of the continuous course of conduct exception " 'is meant to apply not to all crimes occurring during a single transaction but only to those "where the acts testified to are so closely related *in time and place* that the jurors reasonably must either accept or reject the victim's testimony in toto." ' " (*Jenkins*, *supra*, 29 Cal.App.4th at p. 299, italics added.) Further, "[t]his branch of the 'continuous conduct' exception . . . applies if the defendant tenders the same defense or defenses to each act and if there is no reasonable basis for the jury to distinguish between them." (*People v. Crandell* (1988) 46 Cal.3d 833, 875 (*Crandell*).)

The preconditions for applying the continuous course of conduct exception are not present here. First, the disparate alleged misrepresentations on which the People relied to establish Lewis's guilt were not " ' "closely related in time and place." ' " (*Jenkins*, *supra*, 29 Cal.App.4th at p. 299.) On the contrary, for both of the time periods, the alleged misrepresentations were made over the course of months and years, spanning

19

treatment by several different doctors. Second, this is not a case in which " ' "jurors reasonably must either accept or reject the victim's testimony in toto." ' " (*Ibid*.) Due to the nature of the alleged misrepresentations — which depend on different underlying facts — the jury could have easily decided that Lewis made some of the misrepresentations but not others. For example, one juror could have concluded that Lewis *was actually in pain and was disabled*, but that he was at fault for intentionally failing to disclose that he had preexisting conditions. A different juror could have reached an opposite factual conclusion by deciding that Lewis was *faking his pain and disability*. Third, Lewis did not "tender[] the same defense or defenses to each act." (*Crandell*, *supra*, 46 Cal.3d at p. 875.) Instead, as we have explained, he set forth completely different theories as to why he should not be convicted as to the different alleged misrepresentations.

The opinion most closely on point — and relied upon by the People for the application of the continuous course of conduct exception — is *People v. Dieguez* (2001) 89 Cal.App.4th 266, 276, which discussed how the continuous course of conduct exception applied to a prosecution for workers' compensation insurance fraud. In *Dieguez*, the defendant claimed pain in several different body parts, all of which he attributed to lifting a heavy package at work. Among other things, the defendant was prosecuted for one count of insurance fraud (Ins. Code, § 1871.4, subd. (a)(1)) based on several statements he made to a single doctor during a single office visit concerning his various physical symptoms, his medical history and the cause of his injury (*Dieguez*, at pp. 273, 275).

20

*Dieguez* concluded that despite the fact that the defendant made several misstatements during the doctor's office visit, the continuous course of conduct exception applied. It reached this conclusion because "the statements were made at the same appointment . . . ; they were successive, compounding, and interrelated one to another; they were all aimed at the single objective of obtaining workers' compensation benefits"; and the defendant asserted the same defense to all of the alleged misrepresentations, claiming they all arose from innocent mistakes in communicating. (*Dieguez*, *supra*, 89 Cal.App.4th at p. 275.)

Importantly, however, the defendant in *Dieguez* made earlier misrepresentations to other individuals (his employer's personnel manager and his own attorney) concerning his workers' compensation claim. Those misrepresentations were charged in a separate count of insurance fraud. In the course of its discussion, *Dieguez* commented that the misrepresentations on which the two different counts were based "were separated in time by over two months, and concerned two separate transactions, in which appellant's criminal intent was factually distinguishable," so that those misrepresentations "did not form one continuous transaction for purposes of the unanimity instruction." (*Dieguez*, *supra*, 89 Cal.App.4th at p. 276.)

*Dieguez* does not support the People's contention that the continuous course of conduct exception applies here. This case does not involve a single doctor visit or a single defense to each of a series of interrelated misrepresentations as was the case in *Dieguez*. Instead, it involves separate misrepresentations made to several different people over a long period of time, as well as distinct defenses to the different

21

misrepresentations. Accordingly, this case is much more like the second situation discussed in *Dieguez,* in which misrepresentations took place over a long period of time and were made to different people and thus did *not* form one continuous course of conduct.

ii. *The Applicable Statutes Do Not Contemplate a Continuous Course of Conduct*

The second instance in which the continuous course of conduct exception applies is " ' "when . . . *the statute* contemplates a continuous course of conduct of a series of acts over a period of time." ' " (*Hernandez, supra*, 217 Cal.App.4th at p. 572.) Under this approach, "[t]he continuous course of conduct exception has been 'applied to varying crimes that cover " 'repetitive or continuous conduct' " [citation] such as child abuse [citations]; misdemeanor child annoyance or molestation [citations]; pimping [citation]; pandering [citation]; failure to provide for a minor child [citation]; contributing to the delinquency of a minor [citation]; and dissuading a witness from testifying [citation].' " (*Jenkins, supra*, 29 Cal.App.4th at p. 299.)

The first three statutory provisions under which Lewis was convicted are all subdivisions of Penal Code section 550, each of which describe *distinct events* of criminal conduct in connection with making a claim for insurance benefits. Subdivision (a)(1) makes it a crime to "present . . . any false or fraudulent claim" for payment. (§ 550, subd. (a)(1).) Subdivision (a)(5) makes it a crime to "[k]nowingly prepare, make or subscribe any writing" in support of a false claim. (§ 550, subd. (a)(5).) Subdivision (b)(3) makes it a crime to "[c]onceal, or knowingly fail to disclose the occurrence of, an

22

event."  (§ 550, subd. (b)(3).)  Case law specifically has established that "[i]nsurance fraud under section 550 is . . . concerned with the *means*, rather than the *end*."  (*Zanoletti*, *supra*, 173 Cal.App.4th at p. 560 [two separate crimes were completed when the defendant, under a common scheme to obtain benefits, presented a false claim and prepared a writing in support of the false claim].)  As such, the statute does not " ' "contemplate[] a continuous course of conduct of a series of acts over a period of time" ' " (*Hernandez*, *supra*, 217 Cal.App.4th at p. 572), pursuant to a "general scheme to present fraudulent insurance claims" (*Zanoletti*, at p. 560), but instead criminalizes specific acts in the course of carrying out that scheme.[4]  In this case there were numerous

---

[4]      We note that when Penal Code section 550, subdivisions (a)(1) and (a)(5) refer to the making of an insurance "claim," those provisions use the term "claim" in its "common meaning" and "intend[] to proscribe the presentment of *any* false demand under a policy of insurance *irrespective of the form of that demand*" (*People v. Teitelbaum* (1958) 163 Cal.App.2d 184, 212, italics added), which encompasses any of the various requests for payment made by Lewis or his healthcare providers over the course of Lewis's treatment and absence from work.  Indeed, the jury was instructed, according to CALCRIM No. 2000, on the meaning of the term "claim" as used in Penal Code section 550, subdivision (a)(1) and (5).  "A person claims, makes, or presents a claim for payment by requesting payment under a contract on insurance for a loss or injury or health-care benefit.  [¶]  A claim for payment of a health-care benefit includes a claim submitted by or on behalf of the provider of a workers' compensation health benefit defined in the Labor Code."  Over the course of Lewis's treatment, his doctors submitted numerous updates to SCIF describing Lewis's current condition to obtain payment for medical expenses and authorization for further treatment.  Further, these updates were used by SCIF to authorize ongoing disability payments to Lewis on a monthly basis in lieu of his regular salary.  Lewis also filled out medical forms for different doctors describing his symptoms and prior treatment that his doctors used to evaluate him and submit updates to SCIF.  Thus, each time that Lewis or his healthcare providers requested payment for a medical expense or a disability payment, a new "claim" was made.  Depending on a specific juror's view of the case, different claims at different points in Lewis's treatment could have been false or fraudulent for different reasons, with the two most obvious (and conflicting) possibilities being (1) Lewis was no longer experiencing pain and disability

23

different fraudulent acts done at different times that the prosecutor identified as possibly supporting a conviction against Lewis, including making representations to various doctors at different times about his physical condition and making representations to doctors about his past treatment, any of which different jurors could have focused on in convicting Lewis.

The next two statutory provisions, Insurance Code section 1871.4, subdivisions (a)(1) and (a)(2), focus specifically on workers' compensation insurance fraud, making it illegal to "make or cause to be made a false or fraudulent material statement or material misrepresentation (*id.*, § 1871.4, subd. (a)(1)) and to "[p]resent or cause to be presented a knowingly false or fraudulent written or oral material statement" (*id.*, § 1871.4, subd. (a)(2)). Both of these statutes describe the discrete event of making a particular false statement. We perceive no reason that the observation *Zanoletti* made with respect to the more broadly applicable insurance fraud provisions of Penal Code section 550 should not also apply to the more specific workers' compensation insurance fraud provisions set forth in Insurance Code section 1871.4. As the statute criminalizes specific acts performed in the course of committing insurance fraud, just like Penal Code section 550 does, Insurance Code section 1871.4 addresses the *means* of committing the fraud, not the end, and accordingly, like Penal Code section 550, does not contemplate a continuous course of conduct.

---

at some point in his treatment and was lying about his symptoms to certain doctors; or (2) although Lewis's symptoms were genuine, he falsely represented that he developed them while working, instead of disclosing that both his arm pain and his heel pain were chronic preexisting problems.

24

Finally, we conclude that although a grand theft conviction can in some instances be based on the aggregation of similar thefts (*People v. Bailey* (1961) 55 Cal.2d 514, 519), the count of grand theft by false pretenses *as prosecuted in this case* (Pen. Code, §§ 484, 487, subd. (a)) was not based on a continuous course of conduct with one underlying false pretense, but instead, like the insurance fraud counts, was presented by the prosecutor as based on several distinct false pretenses leading to the various payments obtained by Lewis, with the risk that different jurors could have focused on completely different false pretenses or monetary payments. (See *People v. Laport* (1987) 189 Cal.App.3d 281 [continuous course of conduct exception did not apply in prosecution for grand theft where finding of guilt could have been based on several different distinct acts of taking property because defendant offered distinct defenses].) As stated in the jury instructions, the count of theft through false pretenses was focused on whether there was proof that the defendant made a *specific* misrepresentation leading to a specific payment of money to Lewis.[5]

Accordingly, none of the statutory provisions under which Lewis was convicted contemplates the commission of a crime through a continuous course of conduct of a series of acts over a period of time. The continuous course of conduct exception to the

---

[5] We note that there were at least three distinct types of monetary payments for the 2009 injury, which the prosecutor distinguished in his closing argument: (a) industrial disability leave of approximately $52,000 paid over the course of months; (b) a settlement in late 2011 of approximately $30,000 for permanent disability; and (c) medical expenses over the course of treatment.

unanimity requirement therefore does not apply here, and the trial court was required to instruct the jury on unanimity.

C.      *The Error Was Prejudicial*

Having concluded that the trial court erred in not instructing on unanimity, we examine whether the error was prejudicial.

Although there is a split in the case law as to whether failure to instruct on unanimity is a federal constitutional error to be evaluated for prejudice under the standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 24, "[t]he majority of the courts that have addressed the issue have applied *Chapman.*" (*Hernandez, supra,* 217 Cal.App.4th at p. 576.) Further, the People concede in the respondent's brief that the *Chapman* standard applies here. Accordingly, we apply *Chapman* to evaluate whether the trial court's error in failing to instruct on unanimity was harmless beyond a reasonable doubt. (*Chapman,* at p. 24.)

"Under *Chapman,* '[w]here the record provides no rational basis, by way of argument or evidence, for the jury to distinguish between the various acts, and the jury must have believed beyond a reasonable doubt that [the] defendant committed all acts if he committed any, the failure to give a unanimity instruction is harmless.' [Citation.] For example, where the defendant offered the same defense to all criminal acts, and 'the jury's verdict implies that it did not believe the only defense offered,' failure to give a unanimity instruction is harmless error. [Citation.] But if the defendant offered separate defenses to each criminal act, reversal is required." (*Hernandez, supra,* 217 Cal.App.4th at p. 577.)

Here, there is no way to determine whether each juror agreed that Lewis was guilty based on the same misrepresentations. For example, some of the jurors may have found that Lewis made material misrepresentations about whether he was in pain and disabled on various occasions throughout his treatment, while some jurors may have rejected that finding and instead concluded that Lewis fraudulently failed to disclose that he had preexisting medical conditions. The alleged misrepresentations were very different from each other, each involving their own set of facts to support them, and each accompanied by separate defenses offered by Lewis. A juror could easily have rejected one of the alleged misrepresentations as a basis for the verdict while accepting another.

Case law also holds that an error in failing to give a unanimity instruction is harmless " '[w]here the record indicates the jury resolved the basic credibility dispute against the defendant and therefore would have convicted him of any of the various offenses shown by the evidence . . . .' " (*Hernandez*, *supra*, 217 Cal.App.4th at p. 577.) However, that concept applies only where the circumstances establish that the jury "accepted the prosecution's case in its entirety." (*People v. Thompson* (1995) 36 Cal.App.4th 843, 853.) This is not such a case. As we have explained, the jury rejected one of the grand theft counts. Further, the unanimity problem in this case arises from the risk that the jury did not agree on *how* Lewis went about committing the alleged fraud, i.e., *which representations were material, false and made with an intent to defraud*. Although each juror may have concluded that Lewis committed insurance fraud through *some* means, the record does not reflect any determination by the jury that would allow us to conclude beyond a reasonable doubt that each of the jurors, if asked, would have given

27

the same answer about which of Lewis's representations were material, false and made with an intent to defraud.

The prosecutor's unfocused approach heightened the risk that the individual jurors did not have the same misrepresentations in mind when reaching their verdicts on the different counts. Instead of setting forth a coherent theory of the case in which he explained what the People were claiming as Lewis's materially false misrepresentations, the prosecutor set forth factually inconsistent theories about how Lewis might have committed insurance fraud and, without further guidance, required the jurors to (1) select among those theories, and (2) to decide which of the different misrepresentations corresponded to each of the 10 counts alleged against Lewis. The prosecutor was not required to clarify which acts gave rise to the crimes alleged against Lewis, but since he did not provide that clarification, a unanimity instruction was required.

Under the circumstances, we cannot determine that the failure to give the unanimity instruction was harmless beyond a reasonable doubt.

D.    *Lewis's Remaining Appellate Contentions*

In addition to arguing that the trial court erred in failing to give a unanimity instruction, Lewis argues (1) the trial court erred in admitting evidence of his past workers' compensation claims; and (2) the trial court should have sua sponte instructed on the definition of "common scheme or plan" in Penal Code section 12022.6, subdivision (b). Because we are reversing the judgment based on instructional error independent of Lewis's other appellate contentions, we need not and do not reach these additional arguments.

28

DISPOSITION

The judgment is reversed and this matter is remanded for further proceedings.

_____<br>IRION, J.

WE CONCUR:

_____
    O'ROURKE, Acting P. J.

_____
    AARON, J.