Filed 4/6/16  P. v. Pitchford CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E062793 |
| v. | (Super.Ct.No. FVI1301478) |
| JOHNNIE CLARANCE PITCHFORD, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Debra Harris, Judge.  Affirmed.

Eric S. Multhaup, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Scott C. Taylor, and Charles C. Ragland, Deputy Attorneys General, for Plaintiff and Respondent.

1

At trial, the prosecution presented evidence that defendant and appellant Johnnie Clarance Pitchford subjected his ex-girlfriend to an hours-long assault in her apartment. The evidence showed that defendant caused the victim significant injuries by repeatedly punching her in the face and cutting her with a razor blade. The jury found defendant guilty of aggravated mayhem (Pen. Code, § 205,[1] count 3) and torture (§ 206, count 4), and found true that he personally used a deadly weapon in committing those offenses (§ 12022.3).[2] Following trial, defendant admitted two prior strike convictions. (§§ 1170.12, subds. (a)-(d), 667, subds. (b)-(i).) The court sentenced defendant to a total determinate sentence of 20 years for the deadly weapon enhancements plus a consecutive indeterminate sentence of 50 years for the substantive offenses.

Defendant raises three arguments on appeal. First, he argues the court should have given a unanimity instruction on the aggravated mayhem and torture counts. Second, he asserts there was insufficient evidence to support the finding of specific intent to maim required for an aggravated mayhem conviction. Third, he contends the trial court erred by giving a flight instruction based on a text message defendant received about purchasing a plane ticket. For the reasons discussed below, we affirm.

---

[1] All unspecified statutory references are to the Penal Code.

[2] The jury could not reach a unanimous decision on the counts of attempted murder (count 1); assault to commit rape, sodomy, or oral copulation in the commission of a first degree burglary (count 2); forcible rape (count 5); forcible oral copulation (count 6); and forcible sodomy (count 7). After declaring a mistrial as to these counts, the court granted the prosecution's motion to dismiss them.

I

FACTUAL AND PROCEDURAL BACKGROUND

A.     *Prosecution's Case*

       1.     *The incident*

The victim testified she dated defendant for about two years and they had lived in her apartment for some of that time. Around February or March 2013, she ended the relationship because defendant was stealing money from her, had no job, had been physically aggressive with her, and had hit her two sons. The victim had to ask defendant to leave on numerous occasions before he finally moved out. Defendant refused to accept that the relationship was over, however, and would frequently contact the victim and harass her.

On the evening of the incident, May 22, 2013, the victim had not spoken to defendant for about two weeks. Around 10:00 that evening, after the victim and her sons had gone to sleep, defendant knocked on her door. He told her he wanted to come inside and talk. She told him she was tired and asked him to leave, but he pushed through the door and entered her apartment.

Defendant told the victim he loved her and wanted to get back together. When the victim told him she did not want to be with him, defendant went to the kitchen and grabbed two knives. He held the knives to the victim's neck and threatened to kill her

3

and her sons if she did not stay with him. He told her if she was not going to be with him, "[she] was not going to be with anybody else."

Defendant threw the knives to the ground and pleaded with the victim to get back together with him. When she continued to refuse, defendant began punching her in the face. He punched her about four times. She began screaming and could feel her face swelling. Defendant went into one of the rooms and returned with a blanket.

He put the blanket on the living room floor and ordered the victim to take off her clothes. She refused and defendant ripped open her pajama shirt. When defendant raised his fist to punch her again, the victim complied and took off her pajamas. Defendant vaginally raped the victim on the blanket. The victim did not ask him to stop because she was afraid he would punch her again. After about 20 minutes, defendant's penis "went down" and he forced the victim to orally copulate him until he ejaculated in her mouth.

Defendant brought up the topic of moving to Chicago. The victim told defendant she did not want to move with him and he punched her again. He threatened to take her to the desert and shoot her so that no one would find her. He told her he was going to kill her son. As defendant was making these threats, the victim hid one of the knives defendant had dropped earlier under her armpit.

Defendant began looking for razors. He found a disposable razor in the bathroom and removed the blade. He gave the blade to the victim and told her to cut herself. When

4

she refused, defendant threatened to cut her son B.'s throat. The victim complied and tried to cut her arm, but the blade was too dull.

Defendant searched the apartment for knives and found a bag of new disposable razors in a cabinet. He removed a blade and again ordered the victim to cut herself. When she again refused, defendant went to one of the bedrooms to get B. The victim chased defendant and tried to cut his neck with the knife she had been hiding under her arm. The victim was only able to scratch the back of defendant's neck with the knife before he punched her and wrestled her to the ground. Defendant pinned the victim down by placing his knee on her neck. As they fought over the knife, the blade broke, and the victim tried to cut defendant's legs with the broken blade.

At some point, defendant took the victim into the kitchen, grabbed another razor blade and again demanded that she cut herself. This time when she refused, defendant took the blade, cut her right arm twice, and made two deeper cuts on her left arm. Defendant cut himself and told the victim they were going to bleed together. He then sliced her right hand with the razor so deep she saw her "tendons come out." At this point, the victim feared she was going to die. She kept her hand folded against her body to try to lessen the bleeding.

Defendant took the victim into the bathroom and told her he was going to drown her. When he turned on the bath water, she screamed, "Don't kill me," hoping her

5

neighbors would hear. Defendant punched her in the face and took her into one of the bedrooms, where she continued to struggle against defendant and scream.

Defendant brought the victim back into the living room and sodomized her on the blanket. He told her he was enjoying it because she never let him have sex that way. He forced her to orally copulate him and he ejaculated in her mouth.

Afterward, defendant forced the victim to help him clean up the blood in the kitchen. She had to push the blanket across the floor with her feet to clean the blood because she could not use her hands. After they cleaned the kitchen, defendant placed the victim on the living room sofa. Defendant told her he was going to clean her up and take her to the hospital. He told her to say someone assaulted her so that he would not go to jail.

At some point early in the morning (on May 23, 2013), while the victim was on the sofa, the man who had given defendant a ride to her apartment came to the door. Defendant wanted this man to give him a ride home, but when the man saw the condition of the victim, he refused to get involved and left.

At 6:00 a.m., the victim heard her sons' alarm go off. Defendant told the boys their mother was sick and to leave her alone. The victim did not want her sons to see her.

6

The victim did not see the boys leave for school because she fell asleep or lost consciousness before the boys left the apartment.[3]

When the victim regained consciousness, it was about 7:30 a.m., and she was alone in the apartment. She called her longtime friend and neighbor, Ms. Santos, and asked her to check to see if her boys made it to school. She told Ms. Santos she was dying and asked her to call the police. Fearing defendant would try to take her sons, the victim attempted to call their school to inform the front office she had been attacked and did not want her sons released to anyone. She believed she accidentally called the district office instead of the school, but she nevertheless left this message with the woman who answered and asked the woman to contact her sons' school.

Ms. Santos testified that, after talking with the victim on the phone she decided to check on her because she was worried for the victim's safety. When Ms. Santos arrived in the parking lot of the apartment complex, she saw defendant enter the victim's apartment. Ms. Santos approached the apartment and knocked on the door. Defendant refused to let her in. From the other side of the door, the victim told Ms. Santos in Spanish (which defendant did not speak) to leave or defendant might kill her. When Ms. Santos left, defendant put the victim in the bathtub.

---

[3] On cross-examination, the victim confirmed that she "fell asleep" (defense counsel's phrasing). When the victim described the incident, she testified, "[I] like pass away and don't know anything."

A San Bernardino County Sheriff's deputy testified that he arrived at the victim's apartment around 8:00 a.m. on May 23, 2013. When no one answered the door, he obtained a key and entered the apartment. He found the victim naked in the bathtub. She was "very groggy" and blood was running down her face and arms. Her face was swollen. Defendant was not wearing a shirt and had small scratches on his neck, shoulders, and chest. He also had cuts on his wrists. The paramedics took the victim to the hospital, where she remained for nine days.

A sheriff's detective testified that he found in the victim's kitchen a bloody razor blade on the counter, two broken knives, blood spatter on the floorboard, a mop that appeared to be soaked in blood, and a bag of disposable razors. There was another razor blade on the living room carpet.

Another sheriff's deputy testified that defendant received a text message at 9:41 a.m. on May 23, 2013, from a contact named "Helen," which read: "All right. No problem. Text me when you're all through. And I should tell the travel agent to get the ticket booked. And how much can you come up with? Because I had $200. Can you assist with the rest $480?"

### 2. *The victim's injuries*

The victim underwent surgery to repair the tendons in her right hand. After surgery, she attended physical therapy for a month because she could not stretch out her hand. She received stitches for various cuts on her arms. Her cheekbone was broken,

8

and her whole face was numb.  It took a month for the swelling in her face and head to go down.

A sexual assault nurse examined the victim while she was in the hospital.  The victim had multiple cuts, bruises, and abrasions on her body.  She had a combination of blunt force and sharp force trauma to her head.  Her face was bruised, swollen, and cut.  She had a stab wound on her right shoulder, scratches on her chest, and a cut on her ankle.  The victim's arms were still wrapped from surgery, so the nurse was unable to examine them.  The victim had scratches on her buttocks and five round bruises on her left thigh "consistent with fingerprint-type or grab-type injuries."  She had an abrasion and tear on her vagina and two tears in her anus.  Crime lab testing revealed the victim's DNA on defendant's penis.  The prosecution showed the jury photographs of the victim's facial injuries taken the morning of May 23, 2013, as well as photographs of her hands and arms before surgery.

At trial, which took place over a year after the incident, the victim had long scars on her arms and scars on her wrists and ankle.  She still experienced numbness in her face, particularly near her nose and upper teeth.  She still experienced pain in her right arm.

B.    *The Defense*

Defendant testified he and the victim were still in a relationship on the evening of the incident.  They first met at the McDonald's where they both worked.  They had dated

9

for a month, until he was incarcerated for drug possession. The victim was good to him and would visit him in jail. When he was released, she picked him up and they resumed their relationship. Defendant described their relationship as "great," except the victim's family did not like him because he did not have a job. Defendant testified that he and the victim had never had a physical altercation before the incident. They sometimes argued about her family's expectations for him, but it was "never nothing real serious."

According to defendant, after he moved out of the victim's apartment, he moved to his aunt's home in Victorville and got a job. He and the victim continued their relationship and he would often visit her on the weekends.

The victim was expecting defendant to visit her the weekend of the incident. He arrived at the victim's apartment late on the evening of May 22, 2013, around 11:00 p.m., because he had trouble finding "Coach," the homeless man who would give him transportation from Victorville. Defendant had lost his key to the victim's apartment, so he knocked on the door. After the victim answered the door, she went back to bed.

Defendant stayed outside to smoke a cigarette. He saw his friend, Mr. Kibble, and invited him inside the apartment. He and Mr. Kibble talked for about 20 to 30 minutes in the living room while the victim was in the bedroom. When Mr. Kibble left, defendant made himself something to eat in the kitchen. Afterward, he went into the bedroom and asked the victim to come into the living room with him. They made a bed on the floor

10

with a blanket and had consensual vaginal and anal sex. They talked for a while then had consensual vaginal and anal sex again. The victim willingly orally copulated him.

A few minutes later, around 1:30 a.m., Coach came to the apartment, had something to eat, and left. Defendant and the victim were doing dishes in the kitchen when defendant brought up moving back into the apartment. They got into an argument about their relationship, and defendant told the victim he had met another woman. In response, the victim became angry and accused defendant of cheating on her. Defendant called the victim crazy and, "just out of nowhere" she cut him on his shoulder with a knife. "Out of reflex," defendant "smacked" her. The victim started chasing him with the knife and cut him on the back of his leg.

At some point, the victim acquired a second knife. To defend himself, defendant picked up a razor blade from the kitchen counter. They both swung at each other and each cut the other's left forearm. Defendant dropped the razor and wrestled the victim to the floor in an effort to take the knives from her.[4] They each received cuts during this struggle, and one of the knives broke. The victim cut defendant's neck with the other knife, and defendant punched her in the face.

---

[4] Defendant agreed that, at the time of the incident, he was six feet tall and likely weighed 182 pounds and the victim was approximately five feet four inches tall and 130 pounds.

Defendant continued to hit the victim. She started crying and declared that she wanted to kill herself. Defendant checked his wounds because he "was really concerned about the wound that was on [his] neck because . . . the way it was hurting and the way she tried to saw it."[5] Defendant did not believe the victim actually wanted to kill herself. He felt she was "playing on [his] sympathy." At some point, the victim went into the kitchen and cut her left arm. She also slit her right wrist "a couple times."

Defendant and the victim cleaned up the blood in the kitchen and eventually fell asleep together on the living room sofa. They woke up when the victim's alarm went off at 6:00 a.m. She was late for work, so she called her boss at McDonald's and said she was sick. Defendant went outside to smoke and, while he was smoking, he "received a text from [his] cousin and a couple from Helen," some of which he deleted. According to defendant, Helen was the other woman he had met.

The victim asked defendant to take her sons to school and then drop her off at the hospital. Defendant drove the boys to school in the victim's car and returned to the apartment, where he tended to his wounds because he was bleeding "pretty bad." About 10 minutes later, Ms. Santos, the victim's friend, knocked on the door. The victim told defendant to be quiet and asked Ms. Santos to come back later. The victim's mother

---

[5] The arresting deputy testified defendant had "small scratches" on his neck, none of which looked deep.

knocked on the door about 20 minutes later. The victim did not answer the door and her mother left.

A few minutes after that, Coach came to the apartment to take defendant "back down the hill." Coach saw the victim's face and refused to give defendant a ride home. Coach told them he was "disappointed" and "couldn't believe . . . [they] would let someone else control [their] relationship." Coach was referring to the victim's family. Coach knew about defendant's relationship issues with the victim because defendant had previously "confide[d]" in Coach.

After Coach left, the victim asked defendant to start a bath for her. She wanted to go to the hospital before her sons got out of school. As defendant was running the bath water, the police knocked on the door. The victim did not want the police to come in because she did not want to get in trouble.

Defendant testified the victim had lied and nothing she described at trial had happened. He explained the text message the police found on his phone was in regard to a plane ticket for Helen to come visit him. Defendant testified, "She wanted to meet me, come out here and take a chance to . . . meet me face to face." He did not know where Helen lived; he only knew she lived out of state and wanted help purchasing a plane ticket.

On cross-examination, the prosecutor showed defendant a photograph of the cuts on his right arm and asked how it was possible that one of the cuts was so "straight."

13

Defendant admitted he, not the victim, had cut each of his wrists with a razor blade. Defendant also admitted he had felony convictions for robbery and aggravated battery in 2002, and residential burglary in 2006.

Mr. Kibble testified he and defendant were close friends. He confirmed he spoke with defendant for about 30 minutes inside the victim's apartment around 11:00 p.m. on May 22, 2013. He did not see the victim in the apartment. However, Mr. Kibble also testified defendant and the victim had broken up, and he had not seen defendant around the victim's apartment for about a month.

## II

## DISCUSSION

### A. *Unanimity Instruction*

Defendant contends the court should have given a unanimity instruction for the torture and aggravated mayhem charges. He argues the court was obliged to instruct the jury that it must unanimously agree as to which of the victim's many injuries supported each of the convictions. We disagree.

#### 1. *Torture*

A trial court may be required to give a unanimity instruction, sua sponte, in some circumstances. (*People v. Jenkins* (1994) 29 Cal.App.4th 287, 298-299 (*Jenkins*).) No such instruction is required, however, when the case falls within the "continuous course of conduct exception." (*Id.* at p. 299.) This exception is applicable " 'when the acts are

14

so closely connected that they form part of one and the same transaction, and thus one offense' or 'when . . . the statute contemplates a continuous course of conduct [or] a series of acts over a period of time.' " (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1427 (*Hamlin*).)  A crime based on a course of conduct involves " ' "repetitive or continuous conduct." ' " (Jenkins, *supra*, at p. 299.)  Courts have held that the torture statute contemplates commission by a course of conduct or series of acts.  (*Hamlin*, *supra*, at p. 1429.)

The cases of *Jenkins* and *People v. Robbins* (1989) 209 Cal.App.3d 261 (*Robbins*) are instructive here.  In *Jenkins*, the defendant was convicted of two counts of torture based on subjecting his girlfriend to a series of beatings and abuse that took place over a six-month period.  (*Jenkins*, *supra*, 29 Cal.App.4th at pp. 290-295.)  On appeal, the court rejected the defendant's contention that a unanimity instruction was required to ensure the jury agreed "on *the particular act* constituting the basis for its guilty verdict on each count charging the crime of torture." (*Id.* at p. 297, italics added.)  Based on its conclusion that "the beatings and abuse repeatedly took place over a six-month period," the court reasoned that '[t]he *actus reus* of such a crime is a *series* of acts occurring over a substantial period of time, generally on the same victim and generally resulting in cumulative injury.' [Citation.]" (*Id.* at p. 300.)  Thus, the crime of torture, as charged, was based on a continuing course of conduct, as distinguished from a specific act on a specific day.  (*Ibid.*)

15

In *Robbins*, the defendant entered the home of an elderly woman, sexually abused her, and physically injured her. (*Robbins*, *supra*, 209 Cal.App.3d at pp. 263-264.) He was convicted of two counts of forcible oral copulation and one count of sexual penetration by force. (*Id.* at p. 263.) The jury also found he had inflicted great bodily injury in the commission of each offense. (*Ibid.*) On appeal, the defendant argued the jury should have been instructed it must unanimously agree on the injuries the victim suffered in connection with each count. (*Id.* at p. 264.) The *Robbins* court rejected this contention under the continuous course of conduct exception, reasoning that the defendant's attack "was one prolonged assault, of which the individual blows and other indignities were inseparable components." (*Id.* at p. 266.)

We reach the same conclusion in the instant case regarding defendant's prolonged attack of the victim inside her apartment. The prosecution proceeded on a course of conduct theory for the torture charge. At trial, it presented evidence that, over an approximately seven-hour period (from about 11:00 p.m. to 6:00 a.m.), defendant continually attacked the victim. During closing argument, the prosecution argued that, in contrast to the rape-related charges, the torture charge was based on a continuous course of conduct: "It's this continuous crime. [¶] The torture, that's continuous. That went on for hours. . . . And then within those periods of time where you have this thing going on for hours you have these sex acts that are individualized." The victim's multiple injuries to her head, face, arms, and hands were received during an hours-long act of torture

16

occurring in a single location. We therefore conclude no unanimity instruction was required.

Defendant contends the course of conduct exception is inapplicable where the evidence offered to prove the offense shows multiple separate and discrete criminal acts. The court in *Hamlin* rejected a similar argument, stating, "[b]y its very nature, [an offense based on torture or abuse] is established by proof that the conduct took place repeatedly throughout the charged period of time. [Citation.] Thus, proof of a course of conduct offense will usually consist of evidence of various incidents occurring over a period of time. However, where those incidents can reasonably be found to constitute a course of conduct, and the prosecution charges the crime as a course of conduct, no unanimity instruction is required. In such a case, 'the multiple acts constitute one discrete criminal event.' " (*Hamlin*, *supra*, 170 Cal.App.4th at p. 1451.)

Next, defendant argues a unanimity instruction was required because he offered a different defense to each of the victim's injuries. He points to his testimony that he inflicted the victim's head and face injuries in self-defense, that the victim herself inflicted the razor-blade injuries, and that the victim's genital injuries were the result of consensual sex. We find this argument unpersuasive. There is no "same defense" requirement for the continuous course of conduct exception. Indeed, courts have applied the exception in cases where the defendant has offered various defenses to the multiple alleged acts. (See, e.g., *Jenkins*, *supra*, 29 Cal.App.4th at pp. 294-295, 300 [course of

conduct exception applied even though defendant claimed some of the injuries were self-inflicted and others were inflicted in self-defense].)  In any event, application of the continuous conduct rule is appropriate when "the defendant offers *essentially the same* defense to each of the acts" (*People v. Stankewitz* (1990) 51 Cal.3d 72, 100, italics added), which is precisely what defendant did here.  Defendant testified that the victim had fabricated her testimony and that her injuries were caused when she became jealous about the other woman and began attacking him and cutting herself.  His essential defense was that any injury he inflicted on the victim was done in self-defense or as a reaction to her irrational behavior.  It is clear from the jury's verdict that the jury rejected this version of the facts.

Lastly, defendant's reliance on *People v. Hernandez* (2013) 217 Cal.App.4th 559 is misplaced.  In *Hernandez*, the defendant was charged with a single count of gun possession, however the testimony at trial suggested that defendant possessed a gun on two different occasions under significantly different circumstances.  (*Id.* at pp. 564-566.) The defendant's girlfriend testified that the defendant came to her house and fired shots, whereas a police officer testified that, later the same night, he pulled the defendant over and found a gun in the car's engine compartment.  (*Ibid.*)  The *Hernandez* court held that a unanimity instruction was required because the prosecution did not elect which occasion of possession it was relying on for the charge and because the two occasions were not "so closely connected as to form part of one continuing transaction or course of

18

criminal conduct." (*Id.* at pp. 572, 576.)  Because we have concluded that defendant's prolonged attack on the victim does constitute a continuous course of criminal conduct, *Hernandez* is distinguishable and its holding does not apply.

      2.    *Mayhem*

Defendant contends a unanimity instruction was required for the mayhem count because "there were multiple injuries of varying degrees of seriousness to different parts of the [victim's] body that were incurred during different types of interaction."  The People respond that the instruction was not required because, like the torture count, the prosecution charged and argued mayhem as a continuous course of conduct crime.  We agree with the People that a unanimity instruction was not required for the mayhem count, but for a different reason.

The unanimity instruction "is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed." (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.)  Even in cases where a unanimity instruction is required, the failure to give one is harmless "when disagreement by the jury is not reasonably probable." (*Jenkins*, *supra*, 29 Cal.App.4th at p. 299.)  Here, the record clearly demonstrates the jury was able to unanimously agree as to which of the victim's injuries and defendant's corresponding acts formed the basis of the mayhem conviction.

19

During closing argument, the prosecution proposed to the jury that defendant's act of cutting the victim's right hand with the razor blade was alone sufficient to support the mayhem charge. After deliberating, the jury found defendant guilty of aggravated mayhem and also found he had used a deadly weapon during the commission of that crime. Because the victim's testimony that defendant cut her hand with a razor blade was the only evidence of mayhem through use of a deadly weapon that the prosecution presented at trial, the deadly weapon finding eliminates any concern that the jury disagreed as to which injury and corresponding act formed the basis of the mayhem conviction. The deadly weapon finding demonstrates the jury unanimously agreed that the basis of the mayhem conviction was the victim's hand injury and defendant's act of cutting it with a razor blade. Thus, defendant's concern that some but not all of the jurors based his conviction on the victim's genital injuries (when the jury hung on the rape charges) is unfounded.

B.    *Sufficiency of the Evidence Supporting the Mayhem Conviction*

Defendant contends there was insufficient evidence to support a finding that he intended to permanently maim the victim. This contention is without merit.

In deciding a challenge to the sufficiency of the evidence supporting a conviction, we examine the entire record and draw all reasonable inferences in favor of the judgment to determine whether there is reasonable and credible evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v.*

20

*Jackson* (2014) 58 Cal.4th 724, 749.) In order to be guilty of aggravated mayhem, a jury must find that defendant "*intentionally* and unlawfully caused another person to sustain permanent disability or disfigurement." (*People v. Ferrell* (1990) 218 Cal.App.3d 828, 833 (*Ferrell*), italics added.) The question of defendant's intent is "one of fact for the jury, to be determined by considering all the evidence, including the nature of the instrument used and the manner of perpetrating the crime." (*Id*. at p. 834.) "A jury may infer a defendant's specific intent [to maim] from the circumstances attending the act, the manner in which it is done, and the means used, among other factors." (*Ibid.*)

There is no dispute the victim was permanently disabled and disfigured. At the time of trial, she still experienced numbness on her face and pain in her right arm from the injury to her tendons. She still bore scars on her arms from the razor blade. With regard to the issue of intent, we find the manner in which defendant cut the victim's right hand—with a razor blade and deep enough to expose and injure the tendons—is, on its own, sufficient evidence from which the jury could reasonably infer a specific intent to permanently maim.

Defendant argues that the jury's verdict ignores "[the victim's] testimony that [defendant] told her he was doing this <u>not</u> so she would go through the rest of her life without the use of her hands, but <u>rather so they would bleed to death together</u>, an entirely different intent." The jury was not required to believe defendant's statement to the victim about why he was cutting her hand. The jury was free to infer defendant's true intent

21

when cutting the victim's hand was to maim her. Such an inference would be reasonable in light of how deeply defendant cut the victim's hand, and in light of her testimony that "[defendant] said that if I'm not with him I was not going to be with anybody else."

Defendant next contends the evidence demonstrated "a murder/suicide theme, not . . . a mutilation theme." The argument that death, not mutilation or disfigurement, was the intention behind defendant's actions is unpersuasive. "[A] defendant may intend both to kill his or her victim and to disable or disfigure that individual if the attempt to kill is unsuccessful. . . . [T]he intent to kill [does] not exclude the intent to maim and disfigure." (*Ferrell*, *supra*, 218 Cal.App.3d at pp. 833-834.)

Finally, defendant asserts the victim's facial injuries show he lacked the intent to maim. He claims he only "punched her in the face two or three times, resulting in the type of transitory injuries that accrue to professional boxers." A professional boxer does not step into the ring with an opponent several weight classes above him. As a result of defendant's repeated punches, the victim suffered a broken cheek bone, swelling in her face and head that lasted a month, and numbness in her face and teeth that persisted at the time of trial, over a year after the incident. Defendant's minimization of the victim's facial injuries is unpersuasive. The injury to the victim's right hand alone supports a mayhem conviction.

C.	*The Flight Instruction*

1.	*Additional factual background*

At the prosecutor's request, because she planned to argue the text message from Helen was evidence of evasive behavior and constituted circumstantial evidence of consciousness of guilt, the court gave the jury a flight instruction. This instruction, CALCRIM No. 372, stated: "If the defendant fled or tried to flee immediately after the crime was committed or after he was accused of committing the crime, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled or tried to flee, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled or tried to flee cannot prove guilt by itself." The court also instructed the jury with CALCRIM No. 200, stating, "Some of these instructions may not apply, depending on your findings about the facts of the case. Do not assume just because I give a particular instruction that I am suggesting anything about the facts. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them."

The prosecutor did not mention the text message or the flight instruction in her initial closing argument. In his closing argument, defense counsel argued the text message was evidence the couple had been fighting about "this other woman." He pointed out that if defendant had wanted to flee the scene, he could have easily done so at various points during the incident. In her rebuttal, the prosecutor responded: "We know

23

that [defendant] was texting some person named Helen trying to arrange a flight. He happens to be trying to arrange a flight the night after he's tried to kill his girlfriend—ex-girlfriend, raped and tortured her. So is this some mystery girl that he's so suave that he's got some other girl on the side that he's going to go have a new relationship with or is this some person that's trying to get him out of state because he knows what he's done is wrong?"

### 2. *Discussion*

Defendant asserts the court erred in giving the flight instruction. He argues such an instruction requires "actually attempting to go on the lam, not merely a discussion of inchoate future travel plans."

Defendant is incorrect that a text message regarding travel cannot support an inference of consciousness of guilt. There is no requirement that a defendant must make an actual attempt at escape, such as defendant's example of "tak[ing] a flying leap out of one of [the victim's] apartment windows when the police arrived." Rather, California courts have long recognized that " '*[a]ny conduct* of a defendant subsequent to the commission of the crime tending to show consciousness of guilt is relevant and admissible.' " (*People v. Butler* (1970) 12 Cal.App.3d 189, 193, quoting *People v. Gryszkiewicz* (1948) 88 Cal.App.2d 230, 235, italics added.)

Defendant contends the message "clearly indicates that Helen was arranging to purchase a ticket to visit [defendant] at some point in the future." We disagree that the

24

meaning of the text message was clear. To the contrary, the words in the message support both interpretations—that the ticket was for Helen and that it was for defendant. When viewed together with the surrounding circumstances, however, the text message logically permits an inference that defendant was trying to arrange a flight out of the area to avoid detection. The message was sent shortly after the assault, mentioned a plane ticket, and asked defendant to reply when he was "all through." And, in situations like the one here, where the prosecution relies on evidence of a defendant's evasive behavior as circumstantial evidence "tending to show guilt," the court is *required* to give a limiting flight instruction, like the one given in this case, admonishing the jury that such evidence "is not sufficient in itself to establish . . . guilt." (§ 1127c; *People v. Tuggles* (2009) 179 Cal.App.4th 339, 367.)

We conclude that defendant's claim of error must fail because the flight instruction was required and, if anything, served to protect defendant. As our high court has explained, where "certain types of deceptive or evasive behavior on a defendant's part could indicate consciousness of guilt . . . [t]he cautionary nature of [consciousness-of-guilt] instructions *benefits* the defense, admonishing the jury to circumspection regarding evidence that might otherwise be considered decisively inculpatory." (*People v. Jackson* (1996) 13 Cal.4th 1164, 1224, italics added; see also *People v. Boyette* (2002) 29 Cal.4th 381, 438-439 [defendant benefitted from the cautionary nature of the flight instruction].) Without the flight instruction, the jury would have been left with the

25

prosecution's above-quoted rebuttal argument regarding the text message. The jury could have found this a stronger argument than the defense's claim that Helen was planning a romantic visit to California to meet defendant for the first time. Simply put, without the flight instruction the jurors could have viewed the text message as decisively inculpatory. With the instruction, the jurors were admonished that evasive behavior or an attempt to flee, alone, could not establish guilt. Additionally, CALCRIM No. 200 instructed the jurors to determine all of the facts and not assume from any particular instruction that the court was suggesting anything about the facts. These instructions benefitted defendant, and therefore we find no error in the court's use of the flight instruction.

III

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:


MILLER
      Acting P. J.


SLOUGH
      J.

26